**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**MICHELE F. BANKS,** *et al.*,
Plaintiffs,

v.

**ASHFORD 1369 HOSPITALITY LLC,** *et al.*,
Defendants.

Civil No. 23-1055 (BJM)

**ORDER**

After a three-day jury trial, the jury found Ashford 1369 Hospitality LLC and Universal Insurance Company (collectively, "Defendants") liable for negligent maintenance on the premises of the AC Hotel in Condado, San Juan, which caused plaintiff Michele Banks to slip and fall on the afternoon of June 11, 2021. Dkt. 111. The jury awarded $1,800,000 to Ms. Banks and $150,000 to her husband, co-plaintiff Andre Banks (collectively, "Plaintiffs"). *Id*. at 3. The jury also found that Ms. Banks's own actions or omissions did not contribute to her fall, and that Defendants were fully responsible for causing her injuries. *Id*. Before the court is Defendants' post-trial motion for a new trial and/or for remittitur pursuant to Fed. R. Civ. P. 59. Dkt. 119. Defendants seek a new trial under the theory that evidentiary issues and misrepresentations at trial justify vacating the jury verdict. *Id*. at 7-22. Alternatively, they seek remittitur, claiming that the jury's damages award is unsupported by the evidence. *Id*. at 22-24. Plaintiffs opposed. Dkt. 122. This case is before me with the consent of the parties. Dkt. 18.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 59 states that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1). "[A] district court is free to independently weigh the evidence" when deciding whether

to grant a new trial. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). That said, "a district judge cannot displace a jury's verdict merely because he disagrees with it or because a contrary verdict may have been equally supportable." *Id*. (citing *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996) (internal quotation marks omitted). "[A] jury's verdict on the facts should only be overturned in the most compelling circumstances." *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir. 1988).

Further, when a party argues for a new trial based on alleged errors that were not raised or objected to during trial, such alleged errors are reviewed under the deferential "plain error" standard. *See Aguayo v. Rodríguez*, Civil No. 14-1059 (MEL), 2016 U.S. Dist. LEXIS 81882, at *9-10 (D.P.R. June 21, 2016) ("If an argument is not objected to in a timely manner, the claims are forfeited and will be reviewed only for plain error") (citing *Smith v. Kmart Corp.*, 177 F.3d 19, 25-26 (1st Cir. 1999)). "Under plain error review, we will consider a forfeited objection only if: (1) an error was committed; (2) the error was "plain" (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice." *Smith*, 177 F.3d at 25-26. Prejudice under the third prong requires "a reasonable probability that, but for the alleged error, the verdict would have been different." *Burnett v. Ocean Props.*, 987 F.3d 57, 71 (1st Cir. 2021) (citing *Teixeira v. Town of Coventry ex rel. Przybyla*, 882 F.3d 13, 19 (1st Cir. 2018)). "Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault . . . ." *Smith*, 177 F.3d at 26. (internal citation omitted). "To merit reversal, the error must have resulted in a miscarriage of justice or seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Id*.

Alternatively, a party may seek remittitur of a jury verdict pursuant to Fed. R. Civ. P. 59(e). "A party seeking remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 173 (1st Cir. 2005) (quoting *Currier v. United Techs. Corp.*, 393 F.3d 246, 256 (1st Cir. 2004)). "In reviewing an award of damages, the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it." *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003) (internal quotation marks and citation omitted). "The First Circuit adheres to the maximum recovery rule, which allows the Court to direct a remittitur geared to the maximum recovery for which there is evidentiary support, subject to Plaintiff's right to reject the remittitur and instead proceed with a new trial on the disputed damages claim." *Correa-Carrillo*, 594 F. Supp. 3d at 429-430 (quoting *Trainor v. HEI Hosp., LLC*, 699 F.3d 19, 33 (1st Cir. 2012) (internal quotation marks omitted)).

**DISCUSSION**

Defendants advance several arguments in favor of vacating the jury verdict and holding a new trial: (1) Plaintiffs failed to timely disclose Ms. Banks's medical records containing evidence of an intervening injury; (2) Ms. Banks's W-2 forms were improperly admitted into evidence; (3) Ms. Banks's testimony concerning her transportation expenses was improper; (4) Ms. Banks's testimony concerning her medical expenses and interest on those expenses was improper; and (5) Plaintiffs' counsel made improper statements during his closing arguments. Alternatively, Defendants seek remittitur of the damages award. I will address each argument below.

**A. Disclosure of Medical Records**

Defendants first argue that the jury verdict was marred by the improper disclosure and admission of Michele Banks's medical records. Their main contention is that Plaintiffs failed to disclose Ms. Banks's full medical records until the eve of trial.[1] Defendants claim that this was prejudicial because the records contained a reference to an intervening injury that Ms. Banks suffered in July 2023. Had they known about the intervening injury, Defendants allege, they would have conducted additional discovery regarding the incident, and the experts would have revised their evaluations of the causes of Ms. Banks's injuries. Dkt. 119 at 9.

Plaintiffs contest Defendants' assertion that the medical records were not disclosed until the eve of trial. In support, they offer emails which appear to indicate that the records were sent to Defendants in early November 2024, nearly three months before trial. *See* Dkt. 122-1. In any case, Defendants' claim of prejudice is undercut by the fact that they had adequate opportunity to question, and did indeed question, each of Ms. Banks, Dr. Fernandez, and Dr. Nazario about the intervening injury. Defendants questioned Ms. Banks about whether she informed either of Dr. Fernandez or Dr. Nazario about the intervening injury, allowing the jury to weigh the credibility of her explanation and response. *See* Dkt. 119-2 at 112:16-113:16. Under cross-examination, Dr. Fernandez testified that the intervening injury, which apparently affected Ms. Banks's calf, did not "change [his] opinion on what happened in the fall [on June 11, 2021]." Dkt. 119-3 at 234:4-5. He explained that "[a] calf injury has no impairment adjustment of an ankle or knee injury sustained in the past" and that it would "[a]bsolutely not" have an impact on Ms. Banks's present symptoms. *Id*. at 234:9-17. As for Dr. Nazario, he did not confirm whether the intervening injury could have

[1] Defendants also claim that the medical records were improperly authenticated, but do not appear to claim this requires a new trial. *See* Dkt. 119 at 7-8. In any case, authentication of these records has already been ruled on. *See* Dkt. 91 at 1-2.

contributed to her current symptoms, instead limiting himself to saying that "[i]t could have got worse or maybe not. We don't have that information." Dkt. 119-4 at 274:9-10. Its potential effect being thus opined on by both expert witnesses, the jury could weigh whether the intervening injury might have contributed to Ms. Banks's present symptoms. Considering the above, I find that Defendants have not shown that the admission of Ms. Banks's medical records compel a new trial.

**B. W-2 Forms**

Next, Defendants argue that Michele Banks's W-2 forms were admitted without proper authentication and relevance. This argument is meritless. With respect to authentication, "the proponent need not rule out all possibilities inconsistent with authenticity; so long as the evidence is sufficient to allow a reasonable person to believe the evidence is what it purports to be." *Rosa-Rivera v. Dorado Health, Inc.*, Civil No. 09-1318 (CVR), 2012 U.S. Dist. LEXIS 90275, at *15 (D.P.R. June 29, 2012) (citations omitted). Ms. Banks testified at trial as to where and how she obtained the W-2 forms, indicating that they were sent to her by United Airlines, her employer. Dkt. 119-2 at 80:14-81:8. This is sufficient for identification – contrary to Defendants' assertion, Plaintiffs were not required to call the United Airlines Custodian of Records to authenticate the W-2 forms. As to relevance, the W-2's show how her income changed after the accident, allowing the jury to calculate lost income. The 2019 W-2 is particularly relevant since 2019 was the most recent pre-COVID year before the accident, and is thus very useful in estimating what her salary would have been in a typical year working a full schedule. Therefore, Defendants' arguments concerning the W-2 forms do not provide a reason to order a new trial.

**C. Transportation Expenses**

Next, Defendants argue that Ms. Banks's testimony concerning her post-injury transportation expenditures violated evidentiary orders. At trial, Ms. Banks testified that, as a result

of her injuries, she could no longer handle stairs, rendering her unable to use public transportation to get to and from her work. Dkt. 119-2 at 91:14-92:18. She testified that she spent as much as $200 per day, or $8,000 per year, on Uber and Lyft, whereas before the accident, she would spend around $8-$10 per day. *Id*. at 94:7-8; 92:21-24. Plaintiffs then sought to admit documents purporting to be Ms. Banks's work-related Uber and Lyft receipts. *Id*. at 95:17-20. Defendants objected, claiming that the documents did not meet authenticity requirements. *Id*. at 9:21-96-8. I sustained Defendants' objection since the receipts did not confirm that Ms. Banks was the account holder or contain indicia of being official, final receipts. *Id*. at 96:16-20.

Defendants, however, did not object to Ms. Banks's previous testimony drawn from her personal knowledge about the changes in her transportation expenses. Review is therefore for plain error. Defendants offer a conclusory statement that her testimony was prejudicial, confusing, and contrary to the Court's order at Dkt. 80. However, Ms. Banks's own direct testimony is not subject to the authentication issues on which I denied admission of the documentary evidence. If Defendants had any doubts as to the veracity of her testimony, they should have brought it up on cross-examination. Defendants' argument that Ms. Banks's transportation cost testimony constitutes grounds for a new trial is without merit.

**D. Medical Expenses and Interest**

Next, Defendants take issue with Ms. Banks's testimony concerning her total medical expenses and interest payable on those expenses. Ms. Banks had three surgeries following the accident, none of which were covered by her insurance. *See* Dkt. 119-2 at 74:11-23. In order to pay for the surgeries, Ms. Banks sold a portion of any litigation proceeds she received to a company called US Claims. *See* Dkt. 83-1; Dkt. 119-2 at 74:24-75:3. In exchange, US Claims agreed to pay Ms. Banks's upfront medical expenses. *Id*. Plaintiffs had sought to admit this contract as evidence

to prove Ms. Banks's total medical expenses. Defendants objected, arguing in a motion in limine that evidence of the lien was not relevant and was prejudicial. *See* Dkt. 60. I granted Defendants' motion in limine, pointing out that evidence of Ms. Banks's medical expenses would be better shown through invoices from the medical providers themselves. Dkt. 81. I also noted that evidence of a case related debt could be prejudicial – the fact that a third party was willing to lend Ms. Banks money based on her prospective claim might have led the jury to think her claim was necessarily meritorious. *Id*. Plaintiffs sought reconsideration, which I denied prior to trial. However, I allowed Plaintiffs to use the document to refresh Ms. Banks's recollection of the total amount she owed. Ms. Banks proceeded to testify that the approximate amount of medical expenses was $35,000, with interest doubling the total. Dkt. 119-2 at 75:18-76:14. After reviewing the contract, which was not admitted into evidence, she recalled that the exact total was $72,000. *Id*. at 77:8-19.

Ms. Banks's testimony does not constitute grounds for vacating the jury verdict and ordering a new trial. Ms. Banks was permitted to testify to her knowledge about the total cost of her surgeries. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Since these were her own surgeries and expenses, she has a basis for personal knowledge about the costs, even if they were initially paid by a third party. The prejudice rationale against admitting the contract itself does not apply to Ms. Banks's direct testimony, since she did not discuss the details of the loan arrangement. While direct evidence in the form of invoices or receipts from the medical providers may have been preferable, the jury is permitted to hear direct testimony to the same effect and to weigh its credibility accordingly.

**E. Improper Closing Arguments**

Defendants' final argument in favor of holding a new trial is that Plaintiffs' counsel made improper statements during his closing arguments. Defendants allege that Plaintiffs' counsel misrepresented the law and evidence on key issues and made several inflammatory, prejudicial remarks. *See* Dkt. 119 at 14-19. Defendants did not object to any of these statements during the closing argument itself, so these statements are subject to plain error review. *See supra* p. 2.

Defendants do not persuasively argue that any of the challenged statements led to a different result, or that they "seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Burnett*, 987 F.3d at 71. Plaintiff counsel's most problematic statement was when he claimed Ms. Banks lost $300,000 in funds withdrawn from her 401(k) account, despite the lack of any testimony or evidence for this figure. However, I provided a curative instruction to the jury to disregard the statement, which limited its potential to prejudice the jury. *See Portugués-Santana v. Rekomdiv Int'l Inc.*, 725 F.3d 17, 26 (1st Cir. 2013) ("[I]mproper closing arguments are typically harmless if the judge provides a curative instruction that counsel's argument is not evidence.").

Similarly, Defendants take issue with the following statement made by Plaintiffs' counsel, contending that it violated a prior evidentiary order:

> So, if they cannot even dry the floor when the adjustor comes to investigate, they don't care. Imagine how it is the rest of the time. You can draw from that. You can draw reasonable inferences. And that is reasonable. I can't fathom how is it that your insurance adjuster comes to investigate and your floor is wet where she fell. Does that prove the effectiveness of the security measures? Of course not.
>
> Dkt. 119-4 at 296:16-23.

This statement comes quite close to instructing the jury to take the fact that the floor was wet when Alers visited as evidence that the floor was wet on the date of the accident. Earlier, I had

explicitly instructed the jury against making such an inference. Dkt. 119-3 at 242:7-17. However, at the end of his thought, Plaintiffs' counsel ultimately tied his argument back to whether the safety measures the hotel employed were effective, which was a permissible inference. *See id*. Therefore, I find that any error with this statement does not rise to the level of plain error requiring a new trial.

Defendants' remaining objections also fail to rise to the level of plain error. To summarize, the remaining statements are variously challenged as inflammatory, misstatements of the legal standard, calling for speculation on safety measures, and attacking Defendants' witness, Carlos Alers. *See* Dkt. 119 at 14-15. Defendants do not cite to authority indicating that any of these statements constituted error, prejudiced the outcome, or compromised the fairness, integrity or public reputation of the proceedings. Accordingly, their motion for a new trial based on improper closing arguments fails.

**F. Remittitur**

Last, Defendants argue that the jury's verdict of nearly $2 million in damages is unsupported by the evidence and should be remitted. Apart from separately assigning damages to Ms. Banks and Andre Banks, the verdict amounts are not broken into economic versus non-economic damages. Unlike non-economic damages, economic damages such as lost wages and medical expenses can be discerned based on the numerical evidence presented at trial. As per the First Circuit's maximum recovery rule, *see supra* pp. 2-3, I will determine the maximum amount of economic damages supported by the record; the remaining damages will be treated as compensation for non-economic pain and suffering.

At trial, plaintiffs presented evidence that Ms. Banks earned $67,778.40 in 2019, which was the most recent yearly income figure from before the accident and prior to the COVID-19

pandemic. Dkt. 119-2 at 81:23-82:3. Plaintiffs further showed that Ms. Banks earned $45,707.40 and $21,975.50 in 2021 and 2022, respectively. *Id*. at 88:6-8, 90:8-11. She testified that she had to reduce her hours after the accident and currently works around 60 hours per month. *Id*. at 78:22. At a pay rate of $67.11 per hour, her current annual salary is approximately $48,000 per year. *Id*. at 79:2-3. She also testified that, but for the accident, she planned to retire "between age 66 and 67," which indicates that she planned on retiring in 2028. *Id*. at 97:20-23. Thus, the jury could have reasonably credited her with lost income for eight years, 2021 through 2028. Assuming that, but for the accident, she would have earned her 2019 salary until retiring, the jury could reasonably have credited her with $186,544.30 in lost wages – $22,071.00 in 2021, $45,802.90 in 2022, and $19,778.40 for six years up to and including 2028. As for transportation costs, the jury heard evidence indicating that Ms. Banks now spends around twenty times what she used to spend to get to and from work. She used to spend up to $10 per day to travel to work via public transport, but now spends up to $200 per day. *Id*. at 92:21-24. Ms. Banks further testified to incurring work-transportation expenses of $8000 per year on her current 60-hour per month schedule. *Id*. at 94:7-8. Based on this information, the jury could reasonably have credited Ms. Banks with $49,079 in extra transportation costs.[2] Last, Plaintiffs presented evidence that she spent $20,830.11 on physical therapy and $72,000 on surgeries. *Id*. at 73:23-74:1, 77:19. Altogether, the jury could plausibly have credited her with around $287,000 in economic damages based on the evidence presented at trial.

[2] For each year from 2023 through 2028, her extra transportation costs would be $7,600, which is $8,000 in actual expenses less one-twentieth ($400) that she would have spent using public transit. For 2022, her extra transportation costs must be approximated since she worked fewer days. In the above total, her extra transportation costs for 2022 are reduced by the fraction of her salary between 2022 and 2023. She earned approximately 46% of her 2023 salary in 2022, so her extra transportation costs are estimated at $3480 for that year.

This leaves the remaining $1,513,000 of her award attributable to pain and suffering. Clearly, this is extremely generous. Supporting this award, the jury heard extensive testimony regarding her physical pain at the time of the event, during three subsequent surgeries, and on a daily basis in perpetuity. The accident left Ms. Banks with a permanent disability in her knee, which limits her ability to enjoy life to the degree she had previously. Ms. Banks also testified to the stress caused by her loss of income and consequent jeopardization of her retirement plans.

Case law varies as to whether an award for pain and suffering of the magnitude Ms. Banks received is appropriate. In *Torres v. Kmart Corp.*, this district court upheld a similarly-sized award of pain and suffering damages in a slip and fall case. 233 F. Supp. 2d 273, 278-83 (D.P.R. 2002). Plaintiff Torres slipped and fell on a wet floor at Kmart, causing a permanent back injury. *Id*. at 273; 281. The jury awarded Torres $1,400,000 for pain and suffering, and his wife $200,000. *Id*. As with Ms. Banks, it was undisputed that he would experience a lot of pain for the rest of his life. *Id*. at 281. He was limited in lifting, bending, pushing, and carrying, though not precluded from these activities. *Id*. He was never hospitalized nor required surgery. *Id*. There was no evidence of economic damages, prolonged absences from work, or lost income, though he did express concern that he might eventually become unable to perform his job. *Id*. Overall, the medical experts testified that he suffered a permanent total body impairment of between 16% and 23%, notably higher than the 6% impairment attributed to Ms. Banks. *Id*.; Dkt. 119 at 8.

Similarly, in *Whitfield v. Melendez-Rivera*, 431 F.3d 1 (1st Cir. 2005),[3] the First Circuit remitted a $4 million jury verdict for pain and suffering to $3 million. Whitfield was shot twice in the back of his leg, lay face-down for several minutes in the street, and was arrested and denied medical treatment until an ambulance arrived. *Id*. at 16. While two surgeries were performed, some

[3] This case originated in the District of Puerto Rico before appeal. *See Whitfield v. Municipality of Fajardo*, Civil No. 01-2647 (JP), 2004 U.S. Dist. LEXIS 33562 (D.P.R. Jan. 7, 2004) (district court denial of remittitur).

of his injuries were permanent, causing lasting weakness in his knee, limited range of motion in his ankle, and neurological damage in his calf. *Id*. at 16-17. The circumstances surrounding Whitfield's injury were more harrowing than in Ms. Banks's case, and his permanent injuries were potentially more severe, since the experts found a total body impairment of 19%. *Id*. at 17. On the other hand, evidence showed he was still able to run and was not left with lifelong pain, suggesting his long-term injuries may have been comparable to Ms. Banks's or possibly milder. *Id*.

Last, in *Bielunas v. F/V Misty Dawn*, plaintiff Bielunas suffered an excruciating injury when a multi-ton hatch crushed his foot. 621 F.3d 72, 81 (1st Cir. 2010). The incident led to a permanent injury to his foot that limited his ability to work his previous job on a fishing boat, take long hikes, perform certain household chores, and help neighbors with home-improvement projects. *Id*. He was also left with chronic pain, though he was able to avoid pain medication. *Id*. The First Circuit denied remittitur and upheld the jury's $2,000,000 award for non-economic pain and suffering damages. *Id*. at 80-82.

On the other hand, courts in this district have remitted much smaller jury verdicts for pain and suffering. In one such example, *Raybourn v. San Juan Marriot Resort & Stellaris Casino*, the jury awarded plaintiff Raybourn $500,000 for pain and suffering after a slip and fall in a hotel bathtub. 259 F. Supp. 2d 110 (D.P.R. 2003). The court remitted the award to $300,000, noting that plaintiff was still able to "walk, talk and sit normally even if for short periods of time," "has not lost any of her limbs, has not been reduced to the use of a wheelchair or other walking apparatus, nor was her brain affected in any way as a result of [the] accident." *Id*. at 116. While she did not require surgery, she attended many therapy sessions and was administered at least three shots for pain. *Id*. at 113. The expert witnesses disagreed on whether her injuries were permanent. *Id*. at 113-114.

And in *Martinez v. Isver Inv. Corp.*, plaintiff Martinez received a jury verdict of $260,000 in pain and suffering damages. Civil No. 91-1927 (JP), 1993 U.S. Dist. LEXIS 2076, at *2 (D.P.R. Jan. 27, 1993). Martinez slipped and fell at defendant's guesthouse, injuring his hand. *Id*. at *11-12. He testified to suffering great pain that day and being unable to lift weights and play basketball with his son afterwards. *Id*. While reconstructive surgery was performed, his hand injury was permanent. *Id*. at *6-8. The court found that the $260,000 jury verdict for pain and suffering was not supported by the evidence and remitted his award to $160,000. *Id*. at *11-14.

As for Andre Banks, his testimonial evidence confirms that he also experienced pain and suffering from Ms. Banks's injury, though to a lesser degree. His wife's injury caused him hardship for obvious reasons, such as the pain of witnessing a loved one's pain. Dkt. 119-3 at 9-13. Further, he testified at trial that Ms. Banks helped look after him before her accident, and that the accident thus deprived him of some of the support which he had become accustomed to. *Id*. However, there is no evidence that Andre Banks ever went to any emotional counselling or therapy to treat his alleged mental anguish. As with primary claimants, case law varies in its treatment of pain and suffering damages for derivative claimants. In *Torres*, plaintiff's wife's award of $200,000 was upheld in that case on similar facts to those here. *See* 233 F. Supp. 2d at 281-282. But in *Viera v. Palmanova Plaza*, the court remitted a $100,000 emotional damages award for plaintiff's husband to $50,000. Civil No. 95-2567 (SEC/JAC), 1998 U.S. Dist. LEXIS 17782, at *7-8 (D.P.R. Sept. 28, 1998). The husband in *Viera* was not present at the accident (unlike Mr. Banks), but like Mr. Banks, did not call an expert witness to testify to his mental suffering and trauma. *Id*.

Considering the evidence presented at trial, along with the precedent discussed above, I find that the damages awards for Michele and Andre Banks do not rise to the level of being "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial

of justice to permit [them] to stand." *Rivera*, 415 F.3d at 173 (citation omitted). "There is no mathematical formula for determining the monetary equivalent of non-economic injuries." *Bielunas*, 621 F.3d at 80. The awards are within the range previously upheld for similar pain and suffering, as discussed above. While undoubtedly generous, the jury heard extensive evidence supporting both Plaintiffs' pain and suffering. "[T]ransmitting legal damages into money damages is a matter peculiarly within the jury's ken, especially in cases involving intangible, non-economic losses." *Torres*, 233 F. Supp. 2d at 282. The jury's damages award in this case will not be disturbed.

## CONCLUSION

For the above reasons, Defendants' motion for new trial pursuant to Fed. R. Civ. P. 59(a)(1) is **DENIED**. Defendants' motion for remittitur pursuant to Fed. R. Civ. P. 59(e) is also **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of March, 2025.

/s/ **Bruce J. McGiverin**
BRUCE J. MCGIVERIN
United States Magistrate Judge